UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                              Plaintiff,

            v.

MARVIN TRAYLOR,

                              Defendant.

_____

REPORT & RECOMMENDATION

07-CR-6125L

## PRELIMINARY STATEMENT

By Order dated August 14, 2007, all pretrial matters in the above-captioned case

have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 2).

Currently pending before this Court for report and recommendation is the defendant's motion to

suppress keys and currency found during a search of his person.[1]  (Docket # 18).

Defendant Marvin Traylor (hereinafter "Traylor") is charged in a two-count

indictment with possession with intent to distribute and simple possession of five grams or more

of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (the first count) and 21

---

[1]  Traylor's omnibus motion also sought, *inter alia*, discovery and inspection, *Brady* material, *Jencks*
material, rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence and the
preservation of rough notes.  (Docket # 18).  Each of these requests was either resolved by the parties or decided in
open court by the undersigned on May 14, 2008.  (Docket ## 20, 21).

            In addition, Traylor moved to suppress statements made at the time of his arrest and evidence seized from
the vehicle parked in the driveway of the residence.  (Docket # 18).  The motion to suppress statements was resolved
at the time of the evidentiary hearing conducted on June 10, 2008.  (Docket # 23).  The motion to suppress evidence
seized from the car is not opposed (Docket # 19 at 4) and is thus **GRANTED**.

U.S.C. § 844(a) (the second count).  (Docket # 1).  Both offenses are alleged to have occurred on

or about June 19, 2007.  (*Id.*).

## FACTUAL BACKGROUND

On June 19, 2007, members of the Rochester Police Department executed a search

warrant for an apartment, identified as Apartment 1, located at 100 Chili Avenue, in the City of

Rochester, New York.  The warrant was issued by Monroe County Court Judge Richard Keenan

on the application and supporting affidavit of Rochester Police Officer Daniel Zimmerman

("Zimmerman").  In his affidavit, Zimmerman reported that on two occasions several weeks

earlier, two different confidential informants made controlled purchases of cocaine base from the

apartment.  On the first occasion, which occurred approximately three weeks before the

execution of the warrant, the informant reported to Zimmerman that he had purchased crack

cocaine for $20 from a man inside the apartment whom he described as African-American,

approximately twenty-three years of age, approximately five feet, five inches tall and weighing

between 260 and 300 pounds.  (Affidavit of Daniel Zimmerman ("Zimmerman Aff.") at ¶ 4).

The informant further reported that when he was inside the apartment, he observed the seller

cutting crack cocaine on a plate, from which he handed the informant a few pieces.  (*Id.*).  On the

second occasion, which occurred seven days after the first, another informant purchased a $20

bag of crack cocaine from a man in the apartment.  (*Id.*).  He too described the seller as

African-American, approximately twenty-three years old, five feet, six inches tall and between

260 and 300 pounds.  (*Id.*).  During this transaction, the seller pulled several baggies from his

pants pockets and handed one of them to the informant.  (*Id.*).  The affidavit did not disclose

whether the sales were pre-arranged between the informants and the seller.

The parties have further stipulated to the following facts:

1.  On June 19, 2007, members of the Rochester Police Department ("RPD") executed a state court-authorized search warrant at 100 Chili Avenue, Apartment 1, in the City of Rochester, New York. The RPD officers obtained entry into the common area of the apartment building through an open door.  They then utilized a "ram" to breach the front door of Apartment 1.  Apartment 1 was a studio apartment.  The apartment consisted of a living area containing a bed and other furniture, which adjoined a kitchen area and a separate room containing a bathroom.  Inside the residence, officers observed a male and a female sitting on the bed.  The male was later identified as Marvin Traylor, the defendant.  The female was identified as Jessica Hernandez and she was released at the conclusion of the investigation.  RPD officers handcuffed both individuals.  The location was secured.  RPD officers took photographs of the location prior to it being searched and then searched the location.  They located a closed, opaque, orange "Clorox" wipes container on a shelf in the bathroom.  RPD officers found a scale, new and unused baggies and twenty-five baggies containing a substance believed to be cocaine base inside the Clorox wipes container.  RPD officers then searched the defendant and located keys to Apartment 1 and to an automobile, which was parked in the driveway to the premises.  RPD officers also located $310.00 in US currency, in varying denominations, in the defendant's pocket.  No contraband was observed in plain view.

2.  Following his arrest on 6/19/07, the defendant indicated he resided at 510 Electric Avenue, and indicated and appeared to be 29 years of age, stood 5 feet, 9 inches tall and weighed 155 pounds.

3.  Prior to his arrest on 6/19/07, the police did not observe the defendant at the location on any prior occasion.

4.  Two precursor buys, which were the basis of the search warrant, involved sales of cocaine base on 5/31/07 and 6/7/07.  The descriptions provided of the sellers were male black, about 5 feet, 5 inches tall, approximately 260 to 300 pounds and approximately 23

years old and male black, about 5 feet, 6 inches tall, approximately
260 to 300 pounds and approximately 23 years old, respectively.

(Docket # 27).

On June 10, 2008, this Court conducted an evidentiary hearing on Traylor's motion to suppress.  Officer Zimmerman testified on behalf of the government.  (Docket # 24).  No witnesses were called on behalf of the defense.

Zimmerman testified that on June 19, 2007, he assisted in the execution of the warrant for Apartment 1.  (Tr. 3).[2]  To gain entry to the apartment, the officers used a battering ram to force open the front door.  (Tr. 10).  Inside the apartment, they discovered two individuals – Traylor and a woman, later identified as Jessica Hernandez – sitting on a bed in the main room.  (Tr. 6-7, 14; Docket # 27 at ¶ 1).

Zimmerman described the apartment as consisting of one main room, an adjoining kitchenette and a separate bathroom.  (Tr. 4).  In addition to his testimony, photographs depicting the inside of the apartment prior to and during the search were introduced into evidence.  (Defendant's Exhibits ("D. Ex.") A-G).  The apartment was sparsely furnished and had little, if any, decoration.  The main room contained a box spring and mattress on the floor without sheets, but which was covered with some type of bedspread.  (Tr. 4; D. Ex. A).  A table and two chairs were nearby.  (Tr. 4).  A television was on top of the table, and a portable stereo was next to it.  (Tr. 4; D. Ex. A).  Approximately a dozen DVD movies or video games were also located in the main room.  (Tr. 4; D. Ex. B).  The main room had an air conditioner in the window, window

---

[2]  The transcript of the suppression hearing conducted before this Court on June 10, 2008, shall hereinafter be referenced as "Tr. __."  (Docket # 24).

shades and a portable heating, air conditioning or filtration unit on the floor below the window. (Tr. 12; D. Ex. A).  No dressers or chests were in the apartment; nor did Zimmerman observe any men's or women's clothing (other than one possible item),[3] shoes, coats or jewelry.  (Tr. 5-6, 13). The kitchen contained a stove and refrigerator,[4] and the kitchen sink had a pot and dishes in it when Zimmerman arrived.  (Tr. 5, 12; D. Ex. B).  Other than a trash can full of trash, Zimmerman observed no other items in the kitchen.  (Tr. 5-6, 13; D. Ex. B).  The bathroom had a shower curtain, matching bath rugs, a window shade and a few containers of cleaning supplies on the open shelves.  (Tr. 13, 17-19; D. Ex. C, G).  Zimmerman did not see any pictures hanging on the walls or photographs displayed in the apartment.  (Tr. 4-6).  No correspondence was discovered in the apartment other than a single greeting card.  (Tr. 5; D. Ex. E).

After Zimmerman entered the apartment, Traylor and Hernandez were promptly handcuffed, pat-frisked and placed on the floor, face-down.  (Tr. 8).  Zimmerman then began to take photographs of the apartment.  (Tr. 8).  During the process of doing so, he lifted Hernandez off the ground and seated her on the edge of the bed.  (Tr. 8).  At that point, Hernandez stated that this was her first time in the apartment and that Traylor had brought her there to celebrate her birthday.  (Tr. 9).

During the search of the apartment, Zimmerman observed several containers of cleaning supplies on an open shelf in the bathroom.  (Tr. 17-19; D. Ex. G).  Concealed inside an orange, opaque Clorox wipes container were a scales, twenty-five baggies of cocaine base and an

---

[3]  A review of the photographs suggests the item is an overshirt or light jacket.  In the photographs, Traylor is wearing a t-shirt.  (D. Exs. A, B).

[4]  No testimony was offered as to whether any food was in the refrigerator.

unspecified quantity of unused baggies.  (Tr. 18-19; Docket # 27 at ¶ 1).  After the officers made

this discovery, they searched Traylor's person and found in his pocket keys to the apartment and

a vehicle parked in the driveway, along with currency in the amount of $310.  (Docket # 27 at

¶ 1).


## REPORT AND RECOMMENDATION

Traylor moves to suppress the keys and currency seized from his person.  (Docket

## 18, 26).  The government opposes Traylor's motion, maintaining that the search of Traylor

was a lawful search incident to arrest.[5]  (Docket ## 19, 28).

"On a motion to suppress evidence in a criminal trial, once [the defendant]

establishes a basis for his motion, the burden rests upon the Government to prove, by a

preponderance of the evidence, the legality of the actions of its officers."  *United States v. Wyche*,

307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004) (citing *United States v. Gotti*, 244 F. Supp. 2d 120,

124 (E.D.N.Y. 2003); *United States v. Dickerson*, 113 F. Supp. 2d 324, 326 (N.D.N.Y. 2000));

*see United States v. Pena*, 961 F.2d 333, 338-39 (2d Cir. 1992) (on motion to suppress,

government bears burden of establishing probable cause for warrantless arrest) (*quoting United

States v. Rivera*, 321 F.2d 704, 706 n.1 (2d Cir. 1963)).  In the case at bar, Traylor moves to

suppress only the physical evidence taken from his pockets, and not the narcotics and

---

[5]  The search warrant not only authorized a search of the premises, but also a search of its "storage areas, occupants and curtilage."  The government has explicitly disavowed any reliance on the warrant's purported authorization to search the apartment's occupants.  *See Owens v. Lott*, 372 F.3d 267, 274-79 (4th Cir. 2004) (collecting cases addressing legality of "all persons" warrants), *cert. denied*, 543 U.S. 1050 (2005).  Nor has it advanced any argument under *United States v. Leon*, 468 U.S. 897 (1984), that the officers relied upon that authorization in good faith.

narcotics-related paraphernalia seized from inside the Clorox container.  Thus, the government must establish the legality of the search of Traylor's person.

      A.  **Pat-Frisk of Traylor During Search**:  Traylor does not challenge either the officers' pat-frisk of him prior to the search or his detention during the search.  The legality of those actions is indeed well-settled.  *See*, *e.g.*, *Michigan v. Summers*, 452 U.S. 692, 704-05 (1981) (officers executing a search warrant may detain the occupants of the premises during the course of search); *United States v. Jaramillo*, 25 F.3d 1146, 1152 (2d Cir. 1994) ("*Terry*-type pat-down is permissible . . . with respect to persons who own, occupy, or enter upon private premises on which the officers have the right to conduct a search").  Rather, Traylor challenges the full search of his person that occurred after the narcotics and scales were discovered during the apartment search.  The government maintains that the search was justified as a search incident to arrest because probable cause to arrest Traylor arose from the discovery of the drugs.  *See Chimel v. California*, 395 U.S. 752, 763 (1969) (search incident to arrest must be supported by probable cause for the arrest).

      B.  **Arrest of Traylor and Search of his Person**:  Probable cause to arrest exists when the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008) (internal quotations omitted).  The Supreme Court has counseled that the probable cause standard is "a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois*

7

*v. Gates*, 462 U.S. 213, 231 (1983)).  In determining whether probable cause exists for an arrest, a reviewing court must examine the totality of circumstances surrounding the arrest, *Illinois v. Gates*, 462 U.S. at 230-31, judged from "the perspective of a reasonable police officer in light of his training and experience."  *United States v. Delossantos*, 536 F.3d at 159.  Probable cause requires no more and no less than a "reasonable ground for belief of guilt."  *Maryland v. Pringle*, 540 U.S. at 371 (*quoting Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

   The crux of the dispute in this case is whether the totality of the circumstances confronting the officers at the time they searched Traylor amounted to more, as the government contends, or no more, as the defense contends, than Traylor's "mere presence" at a location where contraband was discovered.  In advancing their positions, both parties acknowledge the well-settled principle that an individual's mere presence at a location for which probable cause to search exists or in the company of another for whom probable cause to arrest exists does not, standing alone, give rise to probable cause to arrest that individual.  *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *Sibron v. New York*, 392 U.S. 40, 62-63 (1968); *United States v. Di Re*, 332 U.S. 581, 593 (1948).  *See*, *e.g.*, *United States v. Boone*, 2003 WL 841088, *5 (S.D.N.Y. 2003) ("mere presence in an apartment where drugs and a firearm are found is insufficient to establish probable cause to arrest a person where there is no reason to link that person to the illegal items"); *Rodriguez v. Griffin*, 1995 WL 347027, *5 (E.D.N.Y. 1995) ("an individual's mere presence at the scene of criminal activity or where a search warrant is being executed is not sufficient to justify an arrest of that individual") (citations omitted).  *See also United States v. Rodriguez*, 392 F.3d 539, 548 (2d Cir. 2004) ("mere presence at the location of contraband does not establish possession") (quoting *United States v. Rios*, 856 F.2d 493, 496 (2d Cir. 1988)).

8

In the government's view, Traylor's presence in the apartment, considered in combination with his companion's statements and the apartment's use as a "drug house," provided reasonable cause to believe that he constructively possessed the concealed drugs found in the apartment. *See United States v. Gordils*, 982 F.2d 64, 71 (2d Cir. 1992) (affirming conviction for drug possession where proof "established 'not mere presence, but presence under a particular set of circumstances that provided a reasonable jury with ample grounds' to conclude that [defendant] possessed the heroin found in [the apartment]") (quoting *United States v. Soto*, 959 F.2d 1181, 1185 (2d Cir. 1992)), *cert. denied*, 507 U.S. 1054 (1993). "Constructive possession exists when a person ... knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Id.* (internal quotations omitted). As the Second Circuit has recognized, a defendant's knowledge and intent are "crucial" elements in determining whether he is guilty of constructive possession of narcotics. *United States v. Paulino*, 445 F.3d 211, 222 (2d Cir.), *cert. denied*, 127 S. Ct. 446 (2006).

Turning first to Traylor's presence in the apartment, several factors are important to consider. First, the apartment was a private dwelling and not a public place. As private property, entry into it could be granted, restricted or denied by its owners or occupants having control over it. *See*, *e.g.*, *United States v. Holder*, 990 F.2d 1327, 1329 (D.C. Cir. 1993) ("[a]ccess to a private apartment . . . is presumably limited, and thus a person's admission to the apartment normally would raise a stronger inference of connection to the activities conducted within"); *Rodriguez v. Griffin*, 1995 WL 347027 at *5 (same). *Cf. Ybarra v. Illinois*, 444 U.S. at 91-92 (probable cause for warrant to search public tavern and its bartender does not justify search of its patrons). Indeed, Traylor and Rodriguez, the only occupants of the apartment at the time

the officers arrived, had apparently locked the door to the apartment from the inside,

necessitating the use by the officers of a ram to breach the door.  (Docket # 27 at ¶ 1).  Second,

the size of the apartment is relevant.  As described above, Traylor was located in a studio

apartment which had only one bathroom, where the drugs were located.  As the only occupants of

the apartment, Traylor and his companion had access to the single bathroom, and the possibility

that one or both would need to use it should have been obvious to anyone else connected to the

location.  *Cf. Holmes v. Kucynda*, 321 F.3d 1069, 1081 (11th Cir. 2003) (probable cause did not

exist to arrest guest present in home where drugs were found hidden in desk drawer of a second

bedroom to which guest did not have access).

      Turning next to Rodriguez's statements, I reject Traylor's contention that they

should be disregarded in their entirety because they are self-serving.  To be sure, they suggested

that it was Traylor, and not she, who had a connection to the apartment.  Specifically, she stated

that Traylor had brought her to the apartment for the first time that day in order to celebrate her

birthday.  Her assertions are supported to some degree by the discovery of a greeting card, with a

heart design – the only paperwork found in the apartment.  In any event, in the absence of

specific reasons to discredit her statements, the officers were entitled to consider them as part of

the totality of circumstances informing their decisions about what actions to take after

discovering the cocaine.

      Having found that the officers were entitled to consider Rodriguez's statements,

the question is what, if any weight, those statements add.  Her statement that Traylor brought her

to the apartment could reasonably have been understood to mean that *he* caused *her* to come to

the apartment.  *See New Oxford American Dictionary* (2001) ("bring: cause (someone or

something) to come to a place"). That statement, coupled with the fact that they were found

inside the apartment, leads to the further reasonable inference that he, not she, had the ability to

gain entry into the apartment – either because he had the keys or because someone was present

when they arrived and invited them inside.

    With respect to the possibility that Traylor was an invited guest, I note the absence

of any suitcases or personal effects that would indicate an intention to stay overnight or for a

longer duration. *See Holmes v. Kucynda*, 321 F.3d at 1075, 1081 (noting arrestee's suitcase,

duffle bag and travel bag of toiletries as evidence that she was "simply a visitor"). With respect

to the possibility that he was a short-term, non-overnight guest, I note that no other individuals

were present who were likely hosts to Traylor and Rodriguez. Thus, for this scenario to have

transpired, the owner or resident of the apartment would have had to have left Traylor and his

companion alone in the apartment despite the presence of drugs in an easily accessible container

on an open shelf in the only bathroom. *See United States v. Gordils*, 982 F.2d at 71-72 (jury

entitled to infer from fact that defendant was left alone in the apartment "with sole responsibility

for guarding it and its contents" that he possessed the drugs that were hidden, as well as those in

plain view). Although such a possibility cannot be ruled out, probable cause turns on reasonable

probabilities, not possibilities.[6] *See Brinegar v. United States*, 338 U.S. at 175 ("[i]n dealing

with probable cause . . . we deal with probabilities"); *United States v. Sepulveda*, 102 F.3d 1313,

---

   [6] It is certainly possible that the twenty-three year old, 260-300 pound, five feet, six inches tall African-American male described in the search warrant affidavit was the tenant of the apartment and that Traylor was simply an invited guest. Other than speculation, however, this Court has no basis to conclude that the officers were unreasonable in their belief that Traylor possessed, at least temporarily, dominion and control over the apartment, either solely or jointly. *See Pringle*, 540 U.S. at 373 (probable cause existed to arrest occupants of a car from which drugs and currency was recovered because "it was reasonable for the officer to infer a common enterprise among the three men").

1316 (1st Cir. 1996) ("[t]o be sure, [defendant] might have been an innocent visitor[;] [b]ut probable cause requires only that the police have reasonable grounds to believe that [defendant] had committed the crime") (internal quotation omitted).

The final factor to weigh is the government's contention that the apartment was not actually a residence, but a drug house.  "A drug house is a dwelling that is not a home, but rather is a place dedicated to the sale of drugs."  *United States v. Heath*, 455 F.3d 52, 67 (2d Cir. 2006) (Hall, J., concurring and dissenting).  The government draws the conclusion that the apartment was being used as a drug house principally from two facts:  the two recent purchases of cocaine by confidential informants from the location and the apartment's sparse furnishings and decorations, including the absence of dressers, clothes, shoes, coats or jewelry.

Courts generally rely on two rationales for concluding that a location is being used as a drug house:  first, the presence in plain view of substantial quantities of narcotics, narcotics paraphernalia and/or narcotics packaging and manufacturing supplies; and, second, evidence of frequent purchases of narcotics from that location.  Courts have found that where individuals are present in a location under these circumstances, the police are entitled to assume that those individuals are involved in the narcotics activity, at least in the absence of countervailing evidence.  *See*, *e.g.*, *United States v. Heath*, 455 F.3d at 57 ("those who are permitted to observe obvious criminal activity in a home are, absent indications to the contrary, likely to be complicit in the offense") (citing cases); *United States v. Sepulveda*, 102 F.3d at 1316 ("[t]he numerous walk-up sales the police had observed confirmed that the apartment was being used for drug distribution and strongly suggested that everyone in the apartment knew of this activity"); *Gordils*, 982 F.2d at 72 ("where a defendant was arrested inside an apartment in which large

12

quantities of narcotics were being packaged in plain view, the jury could infer that he was a trusted member of the narcotics organization operating from the apartment, because permitting outsiders to have such access would compromise the security of the operation").

Neither of these rationales applies squarely in this case.  No substantial quantities of narcotics or narcotics paraphernalia were discovered in plain view.  To the contrary, the drugs were concealed in an opaque container.  In addition, while evidence of previous drug sales from the apartment existed, it was confined to two sales that occurred several weeks before the warrant was executed.  *See Heath*, 455 F.3d at 67 n.5 ("[b]eing present in a 'drug house' would permit inferences that would not necessarily follow from mere presence in a house in which people reside, but from which drugs had been sold on two prior occasions").  What does suggest that the apartment was not being used as a residence is the manner in which the apartment was outfitted. Little furniture was contained therein, and that which was there was consistent with short-term comfort, such as a box spring and mattress, one table and two chairs, a television and portable stereo.  No dressers were found, and, most significantly, no clothing, shoes, coats, or jewelry were located.  No pictures were on the wall, and no photographs or correspondence was recovered.  The absence of these items strongly suggests that the apartment was not being used as a home.  I further find that such evidence, considered with the earlier drug sales and the discovery of twenty-five individually packaged bags of crack cocaine, a scales and unused baggies, makes it reasonably probable that the apartment was in fact being used for illicit narcotics activity.  *See Sepulveda*, 102 F.3d at 1316 ("The apartment in this case was unfurnished and partly boarded up.  There is no indication that it was used for any purpose other than distribution of drugs.").

On the basis of the totality of the circumstances considered from the perspective of a reasonable officer, I conclude that the officers had probable cause to arrest Traylor and search him following the discovery of the crack cocaine and related paraphernalia in the apartment's bathroom.  I reach this determination because Traylor was found in an apartment that had characteristics indicative of its use as a drug house rather than as a residence, pre-packaged cocaine was hidden in an unlocked, accessible container in the only bathroom, two hand-to-hand purchases of cocaine from that apartment had been made within the past month, Traylor's companion volunteered that he had brought her to the apartment and no other individuals were present there (other than his companion).

This conclusion is not one I easily reach.  In my estimation, the circumstances justifying arrest are far from compelling and would fall short of the proof beyond any reasonable doubt standard.  *Cf. United States v. Navedo*, 443 F. Supp. 2d 431, 435 (W.D.N.Y. 2006) (Larimer, J.) ("[t]hat defendant was located in a known drug house . . . is not sufficient to support his guilty conviction beyond a reasonable doubt that he knowingly possessed any and all quantities of drugs that were found anywhere in the location of the drug house, whether in plain view or hidden").  That said, the issue presented here is not whether there is sufficient evidence to exclude all reasonable doubt as to Traylor's guilt, but whether the arresting officers possessed a reasonable basis to believe he was guilty of possession of cocaine.  *See United States v. Holder*, 990 F.2d at 1329 ("[a]lthough [defendant] may be correct that mere presence in an apartment where drugs are found will not, without more, support a *conviction* for possession, the standards required for proof of possession beyond a reasonable doubt and for probable cause for an arrest are quite different"); *United States v. Villegas*, 700 F. Supp. 94, 100 (N.D.N.Y. 1988) ("[t]he

14

probable cause necessary for a warrantless arrest . . . is significantly less than that necessary to prove guilt"), *aff'd*, 899 F.2d 1324 (2d Cir.), *cert. denied*, 498 U.S. 911 (1990).  As to that inquiry, I believe they did.


## <u>CONCLUSION</u>

For the foregoing reasons, it is my recommendation that defendant's motion to suppress the physical evidence seized from his person **(Docket # 18)** be **DENIED.**


    *s/Marian W. Payson*
        MARIAN W. PAYSON
      United States Magistrate Judge

Dated: Rochester, New York
      October   22   , 2008

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[7]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **<u>Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.</u>**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**


_s/Marian W. Payson_
                    MARIAN W. PAYSON
                    United States Magistrate Judge

Dated: Rochester, New York
         October   22   , 2008

---

[7] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).